All right, Marshall, you're going to call the case. Your Honor, this case on the docket 2-15-0511 in the state of Illinois, Defensive Faculty, Michael S. Axtell, defendant, defendant. Currently on behalf of Mr. David A. Cummings, the defendant, Steve Forrest. Currently on behalf of the Defensive Faculty, Mr. Stephen A. Collins. All right, thank you. Ms. Forrest, on behalf of the appellant, you may proceed. Good afternoon, Your Honors. Again, I'm Vicki Koros from the Office of the State Appellate Defender, arguing on behalf of the appellant, Michael Axtell. May it please the Court and Counsel, in this appeal, Michael is challenging the sufficiency of the evidence used to prove him guilty of murder and the propriety of the hearsay evidence used at his trial. I'd like to address the arguments as they were presented in the brief. Michael Axtell stands convicted of first-degree murder for the death of Tammy Stone, not based on evidence of facts, but instead based on a seemingly endless chain of inferences and assumptions far removed from the actual facts. The actual facts reveal that Tammy and Michael were alone in the bedroom for about two minutes when a thud was heard. No one saw what happened inside that bedroom. But Tammy was found on the floor, unconscious. She died of a rare and very unusual brain injury. An autopsy revealed a tear to a cerebral artery, and the State's expert, Dr. Jones, opined that that artery was torn due to some sort of blow. Now, this part of this case, just for the record, is not contesting that he inflicted the blows that resulted in her death. Is that correct? The circumstantial evidence here seems to suggest that he was responsible for the resulting death. Now, the question is the degree of his responsibility. That is, what was his mental state? That is, whether or not he seems to be honing in, and whether or not the evidence establishes beyond a reasonable doubt that he knew this death and created a strong probability of death or great murder. That's correct. That's the gist of his argument? Yes, correct. And, again, all of the evidence at trial suggested not that he was guilty of first-degree murder, but instead was acting recklessly when he took a certain action in that bedroom. Again, there was no evidence of any external injury related to the internal injury, so we don't even know, again, what kind of blow. Dr. Jones couldn't even tell us the specific kind of blow. All she could tell us was that some blow directed to the head or face that caused the head to both rotate and hyperextend in a way exposing the blood vessels to the bony ridges. You were talking about making inferences. I mean, as we frequently have with other cases, other statutes where there's a mental element, there's no way to look into a defendant's mind. Exactly. We have to infer it from the circumstances. Right. So this was the second or third confrontation. She had already been knocked unconscious once by the defendant, correct? I'm not ready to say that she was knocked unconscious by Michael. We know that she was found unconscious for what happened that led to that unconsciousness state. Again, the evidence does not prove that it was Michael. We have evidence. Well, even if she fell off the chair, as he indicated, he knew she was unconscious because Jordan dragged her into the living room very close to his feet, correct? Correct. So it wasn't like he didn't know that she had some event that caused her to be unconscious. Right. He knew that she passed out because he was in the same room with her when that happened. Okay. Does that then heighten the problem here? Knowing that somebody's already been unconscious once and then you engage in activities of causes, I mean, doesn't that provide additional evidence that the person would know that the subsequent acts would create a strong probability because the person's already been unconscious a short time ago? How does that bear on the issue? Again, I believe that this case has to be viewed within the context of a centuries-old rule that Illinois courts have used even in modern times, and that's the bare-fisted blow rule, that a punch does not – I'm sorry if I could just take a moment to explain it the way I'd like to – that a punch to the – some kind of blow to the head or face is not likely to be associated with dangerous or failed consequences. A single blow, and there's a lot of cases that support that argument. Right, and so the question is now whether this case – there's an exception to that rule so that this case should not apply here. And I think that's what the state and what the trial court tried to do below was by introducing evidence of what happened early in the night to suggest that there were multiple blows here so that it takes it out of this context of the bare-fisted blow rule. But again, that event was 40 minutes earlier than what happened in the bedroom, and there were intervening circumstances during that time such that, again, Michael was trying to get out of that house. He knew the police were calling. He was trying to get out. He was collecting his belongings, and he was in a room, and Tammy followed him into that room when something happened in that room. Now, again, we don't know what happened in that room, but we have to use the evidence to make an inference about what his mental state was. But again, a blow itself cannot infer a murderous mental state by just a blow. Yeah, but again, that's this distinguishing feature, I think, that the argument can be made between the cases that you cited and this case. Most of those cases talk about a defendant who inflicts the fatal blow during the initial and sole confrontation with the victim. As Justice Hutchinson alluded to, do we close our eyes in the face? So are you saying that if somebody sees somebody fighting someone else and they're not unconscious, they wake up and then you inflict another blow? It's meaningless to say that you saw the person laying unconscious? Right. So, again, we have evidence that she was unresponsive at some point previous, whether she passed out because of having drank too much or passed out for something. And again, he knew that. He knew. Irrespective of how it happened, he knew she was unconscious. Right. And yet, again, I don't see how there are—I apologize for— It's not an easy question to be asked. It isn't, it isn't. But the point is, is that the events earlier of that night, again, could not impute him with knowledge that what he did in the bedroom was going to lead to a fatal consequence. Why have it if you know somebody was just unconscious? Why is that irrelevant if you saw it? She woke up. She got out. She went out. She smoked a cigarette. She called her daughter. She didn't call the police. She didn't do anything to suggest to him that what happened there was something serious. She just went about her business as she did. Again, her son came in, found her unconscious on the floor. Again, didn't try to bring her some water or tend to her. He just simply dragged her out of the room. So you say the single blow, it always starts anew. No matter what the condition of the victim is in the minds of the defendant, the one-blow rule should apply. Are you all in on that proposition? Again, we also have to remember who this defendant is. And he, in the context of the circumstances that he's in, he's also been drinking heavily during the night. They've been yelling at each other all the night. The fact that he might be a little less careful about her or a little less likely to tend to her or show some kind of empathy towards her doesn't mean that his later actions in the bedroom show that he had a murderous state of mind rather than a reckless state of mind. Are you concluded, I believe, that this is a case of first impression? Is that your position, this is a case of first impression? No, I believe it fits squarely within the bare-fisted blow line of cases. The single blow rule. The single blow rule, right. Because, again, we're looking, this is not, the other cases that seem to suggest that the rule doesn't apply, there's an ongoing attack. There's, you know, along, there's pummeling, there's throwing a person into furniture, there's something else going on there. Well, to try to affect your thought, that there had been a continuing conduct, course of conduct that he was involved in the earlier altercation where she ended up unconscious. Right, but those were separate instances. They can't be completed together because, again, Why not? Because there, first of all, it was about 45 minutes before what happened in the bedroom. And second of all, he wasn't pursuing her throughout the house. He was leaving, he was trying to He didn't have to, he knocked her on her tenses. He didn't have to pursue her across the floor because he was already knocked out. Right, but once, there was still that 20 minutes when they're waiting for, when Tammy is waiting for Megan to come pick him up and take him away, that, you know, again, he's not going outside, dragging her back into the house. Again, they're two separate No, she's sitting on the floor crying after she comes back in. Or before she's sitting on the floor. One of the two times she's sitting on the floor, she goes to talk to Jordan, she calls Megan, and then she goes outside, apparently. The way that I understood the evidence was that there was, earlier in the evening she's on the floor crying, then there's the incident in the kitchen, and then she goes to talk to Jordan, and then when she gets her phone, she's outside. So how many confrontations do we have? Do we believe that the fact that she's on the floor crying is a result of a confrontation, or that's just where she likes to cry? There's no evidence that there was any confrontation. We know that there was yelling and that there was a thud. And Jordan comes out of his room and finds her on the floor crying. And he asks, what happened here? No one answers. And he assumed nothing. And he went back to his room and continued playing video games. Well, that's the first instance, right? That's the first instance of a thud being heard. And again, the thud And there's a second one. Right, and there's a second. Again, the thud is not the sound of a hit or a strike. The thud is the sound of a body falling on the floor. Right. And the second one is in the kitchen when he comes out, and then he does see his mom on the floor, and he drags her away. Who was in the room with her on the first instance where there was a thud? Michael. Michael was sitting on the couch next to her. Again, it's a question between inferences and assumptions that we're making here. We don't know what happened. She doesn't say anything. We know now in the second instance of that thud that she does tell, she does call her daughter and say, I was just beat. So we can make that inference that Michael was the one who struck her, and this is why she called her daughter, and this is why she has a bruise on her face, that it was related to Michael. So if the client in fact couldn't draw the inference, there's an argument going on. A heated argument. She's in the room alone with him, and she falls unconscious. You hear a thud, and she falls unconscious, and he had nothing to do with it. We're not saying he didn't have anything to do with it. He did, but what degree? How much did he have to do with it? What was his mental state at the time? And again, following the bare-fisted low-lying cases, a single strike, whether it was that he pushed her, he did say he pushed her on the bed. So whether it was a push or a punch to the face, that action alone, we can't assume a murderous intent from that action alone because that's not the kind of action where you would attribute a – Are you aware of any authority that stands for the proposition that the trier of fact cannot look at the earlier instances and cannot, if you say, conflate the earlier altercations? You seem to want to apply that single blow rule to the final act, irrespective of what took place before. Do you have any case law that says the earlier confrontations are irrelevant? I don't have any authority, but again, I'm saying that these – it is not controlling of what happened later in the bedroom. Again, the state wants – It doesn't have to be 100 percent controlling, but it could be considered as evidence of her condition, whether he imposed it or not, whether he knocked her out or she fell off the kitchen chair like he said she did. She's still unconscious. She's now weakened. She is different than when – the fact that she wakes up is a good thing. It's not, oh, yeah, she's fine now. No, and I understand that. However, again, she wakes up, but again, she doesn't treat what just happened to her as a great bodily harm. Her son doesn't treat what happened to her. But again, in order to find that there's a great bodily harm, you have to have – you have to know exactly the specific injury that was inflicted, the means of the injury, and here we have just substantial questions regarding the extent of her injury. We know that, again, in the kitchen, we know that she fell, but we don't – we can't attribute that. There's – the facts – he's sitting on the couch. Whether she ran into the refrigerator or he pushed her or hit her, why does that make a difference? He knows that she is unconscious, and her unconscious body is dragged back into the living room, which I assume is carpeted, rather than a kitchen floor. And now she wakes up. Why isn't that relevant to what has occurred over that evening? Again, I'm not saying that it's not relevant, but it doesn't impute a worse state of mind for him later on in the bedroom. Again, she gets up. She makes her call. She's smoking. She's – again, her daughter's trying to keep her out of the house, but she insists on going around the house in order to come back into the house. She doesn't want the police called until Megan and Michael are fighting on the couch. Then she's like, okay, call the police. No, no, no, I don't want him arrested. I just want him escorted out of the house. Again, she doesn't – The language in the statute is knowledge that his acts create a strong probability of death or a strong probability of great bodily harm. So you're saying that the fact that she was unconscious earlier, irrespective of the cause, now you start engaging in physical violence with a person who was just knocked out doesn't create a strong probability of great bodily harm? Again, I'm taking a little bit of issue with the idea that she was knocked out. We know that she had passed out. Okay. She was unconscious. Right. For whatever cause, and now inflicting a blow under those circumstances, somebody who's already just been unconscious, doesn't create a strong probability of great bodily harm. No, I don't believe it creates a strong probability. Again, this isn't – First of all, we don't even know the nature of the blow, really. We know it was some kind of blow, and he says he pushed her. So whether it was a push to get her out of the way, whether it was a blow to just, you know, try to get out of the situation, that single blow, which is the only evidence that we have, is that there was one single blow in that bedroom. Again, that, even with knowledge that she had passed out early on in the evening, doesn't impute a murderous state of mind for him. Are there any cases that you have cited that involve an encounter between a man and a woman? Or are they all man on man, and in some cases, isn't there even language, boys will be boys? Again, I'd have to go back to check. I believe most of those cases, just like the experts who testified in this kind of situation, it's usually men. However, again, there was no evidence that there was a great disparity of size or strength between the two, between Tammy and Michael. Well, they didn't know that there is a difference in their size from evidence that has been presented to the court. We know his size. We know approximately what she weighed from the autopsy result. So we know that there is some difference, and we know that she is a woman. We don't take any of those things into account. Again, I only recall that there was evidence in the PSI of his height of like 5'7", and he weighed a little over 160, and there was some evidence of her being mildly obese and having undergone some lap band surgery before. But again, I don't think that that itself is evidence. Again, unless we have numbers to compare side by side, I can't say that there's evidence here of a great disparity of size. Numbers aren't required. That's true. There's a case that nobody cited. It's a pretty old one called People v. Brackett that talks about the fact that, you know, there was a disparity in size that was determined not from numbers but from mere appearances. And so that was taken into account. The Supreme Court was pretty adamant about that. Okay. And yet, from my view of the evidence, I don't see that disparity here. So again, I suppose you can make an inference based on the evidence on the record, whether there was that disparity. But judging on the other cases that do, when interpreted in the context of this rule, there is a significant weight or significant height or age difference. In this case, I don't believe the facts bear that out. I understand I'm out of time. You are in time and you left time. Any further questions? Yeah. Thank you, Ms. Corsi. We're out of time, everyone. Okay. Thank you. Mr. Rogers, on behalf of the appellate. Good afternoon, Your Honors. Counsel. May it please the Court. My name is Stephen Rogers, and I represent the people of the state of Illinois. First, defense counsel stated that there were a lot of inferences and assumptions made, and I would agree, and that's what a trier fact does. And that's what the trial judge did here. From pages 808 to 815 of the record, there are numerous findings of facts that are made. One is we don't really have to question at this point what happened in the kitchen, because the trier fact stated on the record that the victim was knocked out cold, knocked unconscious by the defendant. And then around an hour later or a little less, the defendant and victim are in the bedroom alone. The victim is yelling. All four individuals hear a thud. They're in the garage. They come running back in. They meet the defendant exiting the bedroom. Well after the thud was heard. Well, I think she sort of acknowledged. I don't think the key to this case is him trying to deny that he was involved in the incidents that led to her death, but she is honing in on the issue. And there is a line of cases that talk about generally a single blow from the bare fist would not be sufficient to establish knowledge that the act creates a strong probability of death or great bodily harm. So why doesn't that rule apply here? Tell us succinctly why her argument in that rule doesn't apply here. Well, Your Honor, I think your wording is perfect, maybe better than mine. I was afraid you were going to say that. Well, no, I heard you the wrong way. But essentially it's that in those cases there's never any lapse of time. It's this immediate one or two punches that are thrown. And often in those cases, at least in Lenielle Nibby, the victim dies when they fall and hit their head. In this case, defendant knocks the victim unconscious. Then an hour later strikes her again. I mean, certainly the defendant doesn't need to be aware of this unusual injury. But when you knock someone unconscious, you learn two things. Either I'm much stronger than that victim or that victim is very susceptible to great bodily harm. And I think that's the gist of it. This wasn't an initial single encounter. This was an ongoing encounter over the course of the entire evening. So you're saying that takes it out of those line of cases? Yes, Your Honor. Well, once you realize what you can do to that victim with a strike, you then knock. And so that's sufficient, that he knew he was going to cause great bodily harm when he struck the victim with what the expert said took a significant amount of force. And the trial judge agreed with that. Was there any medical evidence presented that indicated that intoxication might, of the victim, might in fact add to the fact that it didn't take as much effort or strength to cause this hyperextension and rotation? No, Your Honor. Did anybody testify to that? No. I believe Dr. Jones said alcohol was not a factor in the actual cause of death. I don't believe anyone asked her about if it would factor in the susceptibility to the injury. And then the defense experts were certainly all in on the statistics would say aneurysm. So they never testified to how alcohol would have played a role if he in fact struck her. But we can all, we all know, we're all adults, we've all seen people who are intoxicated. And we have seen how they act and how they might be unsteady and how they might have certain things different than if they were sober. Would any of those things or could any of those things have added to his knowledge that, wow, I knocked her out once, what the heck can I do to her the next time? Absolutely, Your Honor. I think the fact that he's with her all day and she's intoxicated means that striking someone who's standing up alone might cause them to fall. But also, yeah, that if she was more susceptible, he learned that in the kitchen. And the trial judge made that finding that there were two different acts of violence. And then by the time the defendant strikes the victim in the bedroom, he knew that would cause great bodily harm. What do you make of her argument that the trial, the evidence really wasn't definitive as to what happened in that bedroom? She characterized it as a thud, she falls over. So how does the trial judge know what happened? Well, Your Honor, the expert testified that it would take a significant blow to rotate someone's head to the extent that the cerebral artery was torn. The expert also testified that this type of injury would not occur based on a fall. So it wouldn't be just a fall. It would not occur just based on a fall, no, Your Honor. And I mean, the defendant makes statements at times, too, that, oh, I didn't hit her that hard. I mean, maybe after the fact, he didn't think he hit her that hard. But that's what the expert testified to, and that's what the trial judge found as a fact, that he did strike the victim with a significant amount of force. And certainly that is an inference. No one else was there to see it. Doesn't he say something to the police officer that is related in court when the police officer leaves and comes back in and says, she's dead? And he then, doesn't he say something about what happened? Is that what he talks about, I just pushed her, or when does he relate that? To be honest, the recording is around 12 to 14 hours. I believe that when he finds out, he's certainly shocked. And he does say things along the lines of, I didn't hit her that hard. He is kind of disbelief, and the state never argued that he intended to cause death when he did it. It was that he knowingly caused great bodily harm, which led to death. He makes multiple statements that, yeah, I didn't hit her that hard. But he also makes statements, I killed Tammy, I'm a murderer, eye for an eye. I mean, clearly he's not, he wasn't that surprised that he did something. He knew that he was responsible for her death. And nobody, none of the doctors can see any evidence of anger or something. Correct, Your Honor. And yeah, the defense experts, their testimony was just statistically based on her age, her smoking habit. And I think the fact maybe that she was a female slightly gave her a slight increase in the chance of aneurysm. But there was no evidence of an aneurysm. And so the trial judge, and that was basically her finding of fact on that was that I recognize the defense expert's opinion. But it's all statistics. And the person that did the autopsy saw no sign of an aneurysm. Do Your Honors have any questions on the evidence here issue? I don't. No. Okay. Well, the state respectfully requests that this court affirm the defendant's conviction and sentence. Thank you. Thank you. Ms. Gorse, you may address the court here as well. Thank you. Again, Your Honors appear unconvinced that. Well, Francis can be deceiving. Oh, that's true. That's true. But what I want to say is that. Remember that fundamental rule. Again, Tammy. Again, the evidence shows that Tammy was found unresponsive in the kitchen. And Michael knew that. Now, the fact that he then goes into the bedroom and she follows him in and there's more arguing there and there's some action occurs in that. The fact that he knows that she was unconscious earlier before. Again, it doesn't mean that he was practically certain. Practically certainly aware that his act was practically certain. But he doesn't have to be practically certain. You just raised the brain. Creates a strong probability. Right. I think that's less than practically certain. Right. But he doesn't have to know the exact injury that he's going to get. But he has to know that it's going to be a great bodily harm. So there is a qualification of the kind of injury that he thinks is going to happen. All right. The trial court made a finding that unconsciousness is great bodily harm. But again. If she is unconscious, when they walk in, when Megan, Jordan, and Jenna and the other person, John, walk into that bedroom or run into that bedroom, why wouldn't that be, you know, unconsciousness again, great bodily harm? Again, the great bodily harm that we're talking about in the kitchen, I think we're using the wrong term when we're calling that. Because you use the word great bodily harm when we're talking about an aggravated battery. Here we don't have evidence that substantially, that directly attributes the harm of her being unconscious to Michael. So I give you that she was found unconscious. Now the question is, the fact that she's unconscious, how does that change what Michael is thinking or how his actions? Because he knows she's weakened. He knows she's injured. Right. But all we know that he does to her is either strike her or push her. Again, neither of those actions carry the weight of a kind of knowledge as opposed to knowledge required for involuntary manslaughter. But are you saying that striking somebody who's weakened, injured, in a very difficult state, it doesn't matter if you do that versus somebody who appears to be healthy and you think the person's healthy. You're saying that the preexisting circumstances, the weakened condition of the victim doesn't matter. You have to be saying that. And is that correct under the law? It, again, Michael's drunk. Let's not forget that. The same way that Tammy has been incapacitated physically and mentally. How does that depend on his knowledge of his actions? Are you saying that this is an intoxication defense? No, it's not a defense at all. But again, we have to take it in context of what he's thinking. And again, I'm not saying he's not responsible. I'm not saying that he's not at fault. Clearly there is fault here. He is responsible for what happened in the bedroom. But to what degree? Was he consciously aware or did he consciously disregard a substantial risk that this would happen? And that's a balancing act. And in this case, again, we don't have – he was trying to leave. He was trying to get out of the house. And we have this event that happens in the bedroom. Again, I guess the circumstances was that it was – Are you invoking mutual combat? Certainly not because that wasn't brought up at trial, so I can't say that here. He's responsible for what happened in the bedroom. But, again, to what degree? We have a list of cases that say by punching someone or pushing someone, a single strike does not equate knowing murder. And I'm suggesting that the evidence here is that it's showing a disregard of a substantial risk. And the evidence looked at objectively, you're saying, should follow within a single blowhole. Is that what you're saying? Yes. Again, for the reasons stated in the briefs, we ask that you would either reduce the conviction or at the very least grant a new trial. Thank you. Thank you, Ms. Gordon. Thank you. All right, I'd like to thank both counsel for the quality of the argument here this afternoon in this interesting matter. The matter will, of course, be taken under advisement, and a written disposition will be issued in due course. We'll stand in a brief recess while we prepare for the next case. Thank you.